COMMONWEALTH vs. THOMAS PAUL MOORE.

Middlesex. May 8, 1990. - July 18, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Robbery. Malice. Intoxication. Practice, Criminal,* New trial, Argument by prosecutor, Instructions to jury.

In a murder case, the judge correctly denied the defendant's motion for a new trial on the basis that evidence the defendant alleged to be newly discovered was immaterial, that is, it would not have been a factor in the jury's deliberations. [124-127]

At the trial of a murder case, no error was demonstrated in the prosecutor's closing argument that properly commented on the inherent unbelievability of the defendant's testimony [127-128]; that commented on the jury's function [128-129]; that properly compared the differences between the defendant's pretrial statements (to police and others) with his trial testimony [129-132]; that was a substantially accurate generalization of the evidence and was not an improper appeal to the jury's sympathy [132]; and that properly urged the jury to use its common sense to reject the defendant's expert's testimony in light of the Commonwealth's contradicting expert testimony [132-133].

At the trial of a murder case no error appeared in the judge's instructions with respect to the issue of voluntary intoxication. [134-135]

INDICTMENTS found and returned in the Superior Court Department on June 25, 1986.

The cases were tried before *J. Harold Flannery,* J., and a motion for a new trial was considered by him.

*Mary Ellen Kelleher* (*Frank P. Marchetti* with her) for the defendant.

*Michael Fabbri,* Assistant District Attorney (*Elizabeth Keeley,* Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree and armed robbery.

His subsequent motion for a new trial on the ground of newly discovered evidence was denied.[1] He claims error in the denial of the motion for new trial. He also claims that, at the trial, the prosecutor made improper final argument and the judge gave the jury erroneous instructions on the law. We affirm the convictions and also conclude that there is no basis for relief under G. L. c. 278, § 33E.

We recount the evidence at the trial in some detail. In July, 1985, the victim, a homosexual man, placed a personal advertisement in the 70th edition of "Local Swingers," a sexually oriented publication, seeking sexual contact with other men. The ad briefly described the victim and listed his home telephone number.

Sometime after 7 P.M. on Saturday, April 26, 1986, the victim left his apartment and drove to a homosexual bar in Boston. He was wearing a black leather vest. The victim left the bar alone around 8:30 P.M. and headed home, arriving there sometime after 9 P.M.

Shortly before 10 P.M., the victim's upstairs neighbor arrived home. She noticed the lights on inside the victim's apartment; the drapes were drawn and the victim appeared to have company. She locked the main inside door and her apartment door before she went upstairs.

At about 10 P.M., the neighbor heard what sounded like furniture being moved around downstairs. The noises, accompanied by voices and the sound of a television set, appeared louder over the victim's living room. After one-half hour, the noise died down and eventually stopped. Just before 11 P.M., noises from the victim's apartment began again. This time the neighbor heard moaning, banging, and thud sounds coming from different areas of the apartment. Concerned, she started walking down the stairs toward the first floor hallway;

---

[1]The defendant's motion for a new trial was filed in the Superior Court rather than in this court. See the fourth sentence of G. L. c. 278, § 33E (1988 ed.). By the time the motion for new trial was brought to our attention, the trial judge had denied it. A single justice of this court ordered that the appeal from the denial of the motion for new trial be consolidated with the defendant's direct appeal from the judgments of conviction.

the noises grew louder. As she approached the bottom of her stairs, she heard moaning. Terrified, she ran upstairs and telephoned her landlord, David Hartwell (who lived nearby), for help.

Hartwell responded, and found the victim naked and covered with blood on the hallway floor. The victim's arms were handcuffed behind his back, his mouth was taped shut, and his ankles were bound with cloth. Blood from multiple stab wounds stained the floor, baseboard and walls. Hartwell's roommate rushed into the front hallway, spoke briefly with Hartwell, and then ran back to his apartment to telephone the police. Hartwell knelt down next to the victim, and in an effort to revive him tried to remove the tape from his mouth and ties from his feet by using a knife. Emergency medical help came to the scene. Attempts to aid the victim failed, and he was pronounced dead at 12:04 A.M. on Sunday, April 27.

An assistant medical examiner conducted an autopsy. The victim's body was covered with numerous injuries. In addition to being bruised on the face, wrists, knees, and ankles, the victim had suffered stab wounds and two skull fractures.[2] Any one of the fractures and nearly all of the stab wounds were each potentially lethal. All of these injuries were inflicted while the victim was alive.

---

[2]The stab wounds were clustered together in three groups. Five wounds were located on the right front portion of the victim's chest. They were made by a single-edged knife blade measuring at least one inch wide and seven inches long. Inflicted with considerable force, these wounds pierced the victim's lungs, heart, diaphragm, liver, gall bladder, and inferior vena cava, and fractured his breastbone, ribs, and one vertebra. Two stab wounds were inflicted on the right side of the victim's chest, both in an upward angle. The weapon used to cause these wounds had dimensions and characteristics similar to those of the weapon causing the wounds on the front of the victim's chest. Two other stab wounds were located on the victim's upper left back. One was curved, suggesting movement at the time of infliction, and one was only one inch wide.

As for the head injuries, the victim suffered one fracture to the right temple and one to the base of the skull. Both were caused by a blow to the head (as opposed to a fall) and were inflicted at about the same time as the stab wounds.

The assistant medical examiner also observed a number of lateral cuts across the victim's shins and on his knees. The doctor classified these as defensive wounds, i.e., inflicted as the limbs were drawn upward for protection. A sample of the victim's blood was taken and determined to be type "O." Oral cavity swabs tested positive for acid phosphatase, indicating the presence of semen; swabs of the rectal cavity tested negative. After the autopsy, the handcuffs were removed from the victim's wrists and preserved as evidence.

Shortly after the victim's body had been removed, the investigators converged on the premises and began their search for evidence. In the hallway where the victim was found lay a kitchen knife with a single-edged serrated blade measuring seven inches in length and just over one inch in width. The knife was in a pool of blood (type "O"), and had several human body hairs lodged in its hilt. A smaller knife, also stained with blood, lay nearby.

Although there were no signs of forced entry, the apartment appeared to have been ransacked. Drawers lay open, and pornographic magazines (some entitled "Local Swingers") and videotapes were strewn about the premises. The victim's diary, disclosing that some of his prior sexual contacts had been made by telephone, was also discovered. Various items of evidence were secured, including material that had been used to bind the victim's ankles together and a kitchen knife with a small amount of blood on it. Blood stains and bloody sneaker prints were noted. The victim's wallet was in his pants pocket but found to contain no money or credit cards.

Through their investigation of the murder scene and later efforts, the police determined that the victim's Baybank card and Mastercard, a small amount of cash, and the victim's black leather vest were all missing. And although an instruction booklet for a Polaroid "One-Step" camera was found in one of the victim's closets, and dozens of polaroid-type photographs (some depicting the inside of the victim's apartment) were found scattered on the floor, no corresponding camera was ever found in the apartment.

Shortly before 7 P.M. on Saturday, April 26, 1986, the defendant left his apartment and walked a short distance to a bar. There, the defendant met his housemate, Lee Ann Nelson, had a beer and used the telephone. A while later, the two left the bar and walked home, stopping along the way at a local market to buy a few items for Lee Ann's mother, Joan Nelson, with whom the defendant also lived. Just after 8 P.M., the defendant told Lee Ann and her mother that he was going to the racetrack with a friend. The defendant left wearing jeans, a dark T-shirt, his neck chain, a gray hooded sweatshirt, and his hightop sneakers.

About one hour after the victim was left for dead in his hallway, just before 12:10 A.M. on Sunday, April 27, the defendant walked into the Mystic Avenue, Medford, Baybank automatic teller machine (ATM) facility located about two and one-quarter miles from the victim's apartment. Over his gray sweatshirt, the defendant was wearing a black leather vest. Once inside the facility, the defendant inserted the victim's Baybank card into the ATM machine and tried to make a cash withdrawal. After the defendant's three unsuccessful attempts to withdraw funds, the ATM machine retained the card and tendered a receipt to that effect.

The defendant arrived home around 12:45 A.M., and spoke with Joan Nelson, who was awake watching the late news. He told her that he lost all but $11 at the racetrack and later went to a restaurant with his friend.

The next morning the defendant awoke about 9 A.M. and saw Lee Ann at breakfast. The defendant was dressed in jeans, a T-shirt, and a black leather vest. When Lee Ann asked the defendant about the vest, the defendant told her he had obtained it from his parents' house.

The Saturday following the victim's murder, the defendant met a friend of his, Paula Dalton, at a bar. The defendant told Paula that he was not going to put his motorcycle on the road for the summer and asked her if she wanted his leather vest. Paula said she would take it and she gave it to her boyfriend, Ronald Rais. When he learned that the vest belonged

to the victim, Rais turned it over to the police. The vest tested positive for the presence of blood.

About a week and a half after the victim's murder, an employee of Baybank retrieved the victim's Baybank card which had been retained by the Medford Baybank ATM machine following the defendant's unsuccessful attempt to make a cash withdrawal. The employee also obtained the video cassette tape which showed the defendant using the victim's card and from it made a number of still photographs. The card was turned over to the authorities. It later tested positive for "occult" or invisible blood.

After obtaining a search warrant, State and local police searched the defendant's apartment on the afternoon of May 15, 1986. During the search, the defendant arrived home and was immediately placed under arrest. Seized from the apartment and the defendant were the following items: a buck knife and its case, a key ring with a key, a gray hooded sweatshirt, a pair of jeans, two neck chains, and three pornographic magazines (found beneath the defendant's mattress) which were similar to magazines found in the victim's home on the night of the murder. During the search, the police noticed two Polaroid One-Step cameras atop the refrigerator. The police later obtained both cameras.

The key and key ring, the buck knife and case, and the jeans (including one of the cuffs) all tested positive for blood. One of the pornographic magazines found was the 70th edition of "Local Swingers" containing the victim's personal ad soliciting male sexual partners and containing his home telephone number. One of the two Polaroid cameras, purportedly belonging to the defendant, tested positive for blood on the top, sides, and shoulder strap. The defendant was first seen with the camera one week after the victim's murder.

At the time of his arrest, after receiving Miranda warnings, the defendant told State Trooper Donald McPhee that sometime around 11:30 P.M. on Saturday, April 26, 1986, while at a bar in Somerville, a male friend approached him and asked if he wanted to earn some money. The defendant explained that his friend had a Baybank card and asked him

to withdraw some cash from an ATM machine in return for $20. The defendant agreed to the arrangement. The defendant said that he drove in his friend's car to the Mystic Avenue, Medford, branch of Baybank, arriving there about midnight. He also told the police that he tried the card but because he did not know the code, the ATM machine retained the card. When the police asked the defendant his friend's name, the defendant said he "[did not] want to get him involved . . . ." During questioning, the defendant stated that he was wearing a windbreaker on the night of April 26. He denied ever owning or possessing a black leather vest.

Within a few days of the defendant's arrest, Trooper McPhee spoke to a nine year old boy who was a friend of the defendant. The boy told the police that sometime during the week of April 20, 1986, he was with the defendant when the defendant purchased a set of silver handcuffs, complete with keys, from a store in Somerville. Although the boy held the handcuffs momentarily while in the store, he never saw them again. Thereafter Trooper McPhee went to the store and purchased a set of handcuffs identical to the ones the defendant bought prior to the victim's murder and to the pair removed from the victim's wrists during the autopsy of his body.

The defendant testified at trial that, on Saturday, April 26, 1986, he was at a bar in Somerville for most of the evening. He admitted that when he left his apartment for the bar, he told Joan Nelson that he was going to the racetrack with a friend. He claimed he had lied to her because he did not want Lee Ann following him around that night.

The defendant testified that sometime around 11:30 P.M. while at the bar, a male then known only to him as "Ron" approached him about making some quick money. (The defendant indicated that in the course of the investigation of the crime, and from other testimony at the trial, he had learned that Ron's last name was Rais.) Ron allegedly had a Baybank card and wanted the defendant to withdraw some cash from an ATM machine. In return Ron would pay the defendant $20 or $25. The defendant agreed to the deal.

The defendant further testified that the two men then drove in Ron's car to the Medford Baybank, arriving there around midnight. Because it was raining, the defendant borrowed a leather vest from Ron before going into the bank. Once inside the ATM facility, the defendant attempted to withdraw some cash with the Baybank card and code number Ron had given him. Instead of issuing money, the machine kept the bank card and issued the defendant a receipt indicating that the card had been retained. The defendant left the bank, told Ron what had happened, and gave him the receipt. The two men then drove back to the bar and eventually parted for the evening.

The defendant stated that he bought the Polaroid One-Step camera, found in his apartment after the victim's murder, around the beginning of May, 1986. Although he conceded that he had purchased a set of handcuffs prior to the victim's murder, he asserted that he bought them for the young boy and last saw them at a party on April 19, 1986, when the children were playing with them.

As for the vest, the defendant testified that he forgot to return it and brought it home with him. He gave it to Paula Dalton the week after Ron loaned it to him. The defendant denied telling Paula that he was giving the vest away because he was not putting his motorcycle on the road. The defendant said he failed to tell the police Rais' name at the time of his arrest because he was afraid that Rais might retaliate against him, Lee Ann, and her young children.

1. *Motion for new trial.* The defendant's motion for a new trial was based on the ground of newly discovered evidence. The evidence alleged as newly discovered was that Ronald Rais' middle name was Paul, that he lived in Medford, and that he had a tattoo on his chest and a small tattoo on his wrist. The evidence is significant, according to the defendant, because at trial there had been reference to an entry in the victim's diary made in March, 1986, stating that he (the victim) had had a sexual encounter with "Paul (Medford)" who

had a "small tattoo."[3] Thus, the defendant maintains, the evidence supports his claim at trial that someone else had committed the murder. The motion was supported by portions of the grand jury minutes pertaining to the victim's diary entries, a death certificate indicating that Rais had been shot to death in Orlando, Florida, on December 16, 1986, the autopsy report pertaining to Rais, indicating that he had tattoos near his breast and on one wrist, and an affidavit from a man "closely associated with the gay community" that "it is common for gay people to have tattoos in and around the . . . breast area" which is considered "a point of sexual orientation." Neither the defendant nor his attorney filed an affidavit setting forth the steps which had been taken prior to or during the trial to secure the evidence he now contends is newly discovered. The trial judge denied the motion without a hearing. The judge stated in his endorsement: "The information [about Rais] adds nothing substantive to what was known at the time of trial. Presentation of it to a jury now would create no doubt concerning the correctness of the 1987 trial verdict."

A trial judge upon motion in writing may grant a new trial if it appears that justice may not have been done. Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1969). A motion for new trial is addressed to the sound discretion of the judge, *Commonwealth* v. *Smith*, 381 Mass. 141, 142 (1980), and the judge's disposition of the motion will not be reversed unless it is manifestly unjust, *Commonwealth* v. *Little*, 384 Mass. 262, 269 (1981); *Commonwealth* v. *Leavitt*, 21 Mass. App. Ct. 84, 86 (1985), or unless the trial was infected with prejudicial constitutional error. *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981). Reversal for abuse of discretion is particularly rare where the judge acting on the motion was also the trial judge. *Commonwealth* v. *Leavitt, supra* at 85. *Commonwealth* v. *Gordon*, 13 Mass. App. Ct. 1085 (1982).

---

[3]The evidence about the diary entry was brought out at trial by the defendant's counsel, and relied upon by the defendant to support his case.

A new trial motion may be granted on the ground of newly discovered evidence, *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 21 (1923), so long as that evidence was unavailable at the time of trial despite the due diligence of the moving party, *Sharpe, petitioner*, 322 Mass. 441, 444 (1948), and is material. *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651, 654 n.1 (1980).

The judge grounded his denial of the motion on the last factor, the insubstantiality of the allegedly newly discovered evidence, concluding that it cast no doubt on the jury's verdict. The judge was clearly correct on the point.

The standards governing an assessment of the probative value of allegedly newly discovered evidence are set forth in *Commonwealth* v. *Grace*, 397 Mass. 303, 305-306 (1986), as follows:

"The evidence said to be new not only must be material and credible (*Commonwealth* v. *Brown*, [378 Mass. 165, 172 (1979)]), but also must carry a measure of strength in support of the defendant's position. See *Commonwealth* v. *Brown, supra* at 171; *DeLuca* v. *Boston Elevated Ry.*, 312 Mass. 495, 497 (1942); *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 32-33 (1923). Thus newly discovered evidence that is cumulative of evidence admitted at the trial tends to carry less weight than new evidence that is different in kind. See *Commonwealth* v. *Grace*, 370 Mass. 746, 753 (1976). Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial. *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651, 654 (1980). The strength of the case against a criminal defendant, therefore, may weaken the effect of evidence which is admittedly newly discovered. *Commonwealth* v. *Dascalakis, supra* at 33. The motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations. See *Davis* v. *Boston Ele-*

> *vated Ry.*, 235 Mass. 482, 495-496 (1920); *Common-*
> *wealth* v. *Markham, supra.* This process of judicial
> analysis requires a thorough knowledge of the trial pro-
> ceedings (*Commonwealth* v. *Dascalakis, supra* at 32),
> and can, of course, be aided by a trial judge's observa-
> tion of events at trial (*Commonwealth* v. *DeChris-*
> *toforo*, 360 Mass. 531, 543 [1971])."

The case against the defendant, as can be seen from the
description of the evidence set forth above, was powerful.
The jury knew that the defendant claimed that he had ob-
tained the victim's vest and Baybank card from Rais. There
was no evidence at trial that a man named Paul from Med-
ford with a small tattoo had been involved in the murder.
Indeed, there is nothing to link Rais at all to the murder
apart from the defendant's testimony. The diary entry was
made at least a month before the murder and simply de-
scribed a sexual encounter between the victim and an un-
identified male known as "Paul (Medford)." In rejecting the
defendant's contentions about the evidence, the judge relied
upon his knowledge of the trial and the inherent lack of con-
vincing force in the defendant's position. We conclude (as
did the judge) that the supposedly newly discovered evidence
would not have been a real factor in the jury's deliberations.[4]

2. *Prosecutor's closing argument.* The defendant argues
that five portions of the prosecutor's closing argument were
improper, and that the comments considered either sepa-
rately or in combination require a new trial. We disagree,
and proceed to discuss each criticized portion of the closing
argument.

(a) The defendant argues that the prosecutor impermissi-
bly shifted the burden of proof to him by asking in her clos-
ing that the defendant "explain" the occult blood found on

---

[4]Our conclusion that the judge's ruling was correct makes it unnecessary
to consider the Commonwealth's additional argument in support of the de-
nial of the motion that the defendant failed to satisfy his preliminary bur-
den of establishing that, despite reasonable diligence, he would not have
discovered the evidence in time to make use of it at the trial.

certain items seized at the time of his arrest. There was no objection made by the defendant's trial counsel to the argument.

At trial, the Commonwealth introduced evidence that the jeans the defendant wore on the night of the victim's murder, as well as his buck knife and key ring, were stained with blood. To counter that evidence, the defendant testified that a few months before the murder he had a fight with Lee Ann Nelson's sister, Lynn, in which he was scratched, and that he periodically received cuts on his hands at work. The defendant vigorously argued this counter evidence at closing.

When the prosecutor's comment is viewed against the background of the entire case, it is clear that she was not, as the defendant claims, attempting to shift the burden of proof to him. Rather, she was commenting on the inherent unbelievability of the defendant's account. See *Commonwealth* v. *Andrews*, 403 Mass. 441, 457 (1988). The prosecutor was not asking the defendant to explain the blood, but noting that, in the absence of some other explanation, the Commonwealth's explanation of the reason for the blood tended to prove the Commonwealth's case. Her comments were proper and, particularly in light of the judge's careful instructions that the defendant had no obligation to explain or refute any evidence presented against him, created no misimpression. *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416 (1978).

(b) The defendant argues that the prosecutor improperly equated the Commonwealth's function at trial with the jury's function by means of the comments set forth below.[5] The comments were objected to.

The defendant maintains that the prosecutor's comments confused the jury as to their duty, suggesting to them that they could find the defendant guilty on a lower standard of proof than that required by law. We think the prosecutor's

---

[5] "Now, I have assumed my responsibility as prosecutor in the case. I accepted that responsibility, and I accepted that burden. In a few minutes, ladies and gentlemen, the burden will [pass] from me, as a representative of the Commonwealth, to you, the Commonwealth. And I know that each and every one of you will accept that burden in a responsible way."

comments could be reasonably understood to mean that the focus of the trial would soon shift from the government, responsible for proving the case, to the jury, responsible for deciding the case. So understood, the comments are simply a request that the jury accept its responsibility of returning a just verdict as willingly as the government accepted its responsibility of proving all the elements of the crime. Even if the comments are construed as possibly touching upon the jury's duty, the prosecutor neither asked the jury for a guilty verdict, see *Commonwealth* v. *Sanchez*, 405 Mass. 369, 375 n.4 (1989), nor for a "proper verdict" (with the understanding that a proper verdict would be a guilty verdict), see *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. 283, 286 n.5 (1988), to vindicate the harm caused to the victim.

Moreover, the jury were carefully instructed both before and after the trial on the presumption of innocence and the Commonwealth's burden of proving the defendant's guilt beyond a reasonable doubt. They were further instructed at the outset of the charge on their role as sole arbiters of the facts. The judge also expressly distinguished the jury's function from the prosecutor's function by explaining that "a jury functions independently of the district attorney and . . . independently of the defendant." This latter instruction went directly to the substance of the objection to the comments under consideration that had been made by the defendant's trial counsel. The comments could not have caused any harm.

(c) The prosecutor commented upon the difference between the defendant's pretrial statements about the bank card and the leather vest (that he had used the bank card for a "friend" whom he refused to identify and did not own a leather vest), and his trial testimony on those matters (that he had used the bank card for "Ron" and borrowed the vest from him). The prosecutor suggested that the defendant's trial testimony should be rejected.[6]

---

[6]". . . this man, Ron, he [the defendant] never told anybody about, never told Lynn, never told Lee Ann, never told Paula, never told the police

The defendant maintains that these remarks violated his right to remain silent on Rais' identity until the time of trial and his right to legal counsel. In the defendant's view, the comments violated the principles stated in *Commonwealth* v. *Person*, 400 Mass. 136 (1987). We do not agree.

In *Person*, the defendant testified in his own behalf. In closing argument, the prosecutor asked the jury to consider whether the defendant went to an attorney after the crime "to determine his legal rights or to help build his cover?" *Id.* at 138-139. The prosecutor then proceeded to argue as follows: "[I]sn't it a little bit odd that after sitting here for six days and listening to all the testimony [the defendant] comes in and gives a completely tailored story covering every single aspect." *Id.* at 139.. We considered the first comment an inappropriate attack on the defendant's right to consult an attorney. *Id.* at 141. We also considered highly improper the prosecutor's categorical statement that the defendant had sat through trial, listened to the Commonwealth's witnesses, and then doctored his trial testimony to meet the Commonwealth's case. That line of argument, we said, violated the defendant's fundamental right not to make any statement prior to testifying. *Id.* at 140.

In *Commonwealth* v. *Sherick*, 401 Mass. 302 (1987), we noted that the argument in *Person*, to the effect that the defendant's trial testimony was a fabrication, was improper and prejudicial because no evidence existed to support the argument. *Id.* at 304. We stated that a prosecutor may properly attack a defendant's credibility where there is a basis in the evidence to suggest that "the defendant changed his account of the event to conform with the strong evidence of the Commonwealth." *Id.* In this regard, we indicated that a prosecu-

---

when they asked him repeatedly, who is your friend, who is your friend who gave you the card. All of a sudden, three days later, after he learns that he has been murdered — strike that — he has been killed, all of a sudden we've got a name. His name is Ron. . . . Then after you are arrested and the police say, where did you get the card, oh, a friend. I don't want to get him involved. Well, where did you get the vest? Well, I don't want to talk any more."

tor may contrast a defendant's pretrial statements with his trial testimony, and if he does so the prosecutor "perform[s] his proper function of alerting the jury to possible flaws in the defendant's testimony." *Id.* at 305.

Here, there was considerable testimony about the detailed story given to the police by the defendant on his activities on the night of the murder. As has been indicated, that testimony included an account of the defendant's going to the Baybank with a friend to assist in using the victim's bank card. The defendant's account included an explanation of how the teller machine took the card and a declination to identify the friend because the defendant "did not want to get him involved." In his account to the police, the defendant also stated that he was wearing a windbreaker on the night of the murder, and he denied ever owning or having a black leather vest. As has been indicated, there was also testimony by Lee Ann Nelson and Paula Dalton concerning the defendant's comments to them about the vest.

At trial, the defendant testified for the first time that the man he met in the bar was Ron, that he and Ron had gone to the Baybank in Ron's car, and that he had borrowed a leather vest from "Ron" before going into the bank because it was raining. Further, the defendant's counsel, in examining the investigating police officers and the defendant, made a point of emphasizing that the defendant had at first fully co-operated with the police about his activities on the night of the murder. In closing argument, the defendant's counsel stressed the defendant's cooperation with the police about his use of the bank card, noted that the defendant had not furnished the name of "Ron" because he was afraid of him, and further suggested that the police had "botched" the investigation and had accused the defendant [presumably instead of Rais] "to get out of this mess."

The prosecutor's remarks did not implicate any of the principles in the *Person* case. The argument in this case dealt with the differences between the defendant's pretrial statements to the police and to other witnesses about his contacts and activities on the night of the murder, in particular his

acquisition of both the bank card and the leather vest. All of this was brought out in the evidence at trial. There thus was a basis in the evidence which allowed the prosecutor to suggest that the defendant had attempted to mislead the police and that his testimony at the trial was false. Her argument focused on the quality of the evidentiary picture the defendant was trying to paint, which is, of course, a proper subject for argument.[7] See *Commonwealth v. Lapointe*, 402 Mass. 321, 331 (1988).

(d) The defendant argues that the prosecutor's comments about David Hartwell's efforts to help his friend, the victim, when he first saw him in the hallway were an attempt to inflame the jury and comment on facts not in evidence. The comments were objected to at trial on the ground that the prosecutor had commented on facts not in evidence, and not on the basis of an improper appeal to sympathy. The remarks were designed to deal with a conflict in the evidence as to the number of knives Hartwell had used to assist the victim and from where the knives had been obtained. The issue was a collateral point, and the remarks about Hartwell were nothing more than an effort to analyze his conduct during an obviously grave situation. We are satisfied that the remarks were a substantially accurate generalization of the evidence at trial, *Commonwealth v. Fitzgerald*, 376 Mass. 402, 417 (1978), and were not an attempt to attract sympathy.

(e) Finally, the defendant claims that the prosecutor improperly attacked the credibility of the defendant's expert witness, a pathologist who testified that the victim's assailant would have used his left hand to inflict the wounds received by the victim and would certainly have been covered with a considerable amount of blood. The defendant testified that he

---

[7] We do not read the argument as impermissibly attempting to comment on the defendant's right to interrupt police questioning and consult with counsel. If the argument could be read as tending in that direction, any possible misapplication was eliminated by the judge's instruction to the jury that "no inference may be drawn from a person's decision to ask to speak with an attorney or to refuse to answer questions put by police officers."

was right-handed and offered explanations for the blood that had been found on his belongings. The criticized argument, which was objected to, is set forth below.[8]

The defendant relies upon *Commonwealth* v. *Shelley*, 374 Mass. 466 (1978), *S.C.*, 381 Mass. 340 (1981), in support of his claim. In *Shelley*, express reference was made to the defendant's experts as hired: "You can imagine how well these fellows are paid. I didn't ask them. I didn't think that was the proper thing to do. Do you think they were paid nickels and dimes? . . . [A]re they going to hire somebody and bring him into court if they're not going to testify to what they want them to testify to?" *Id.* at 469 n.1. Moreover, in the course of his remarks in *Shelley*, the prosecutor suggested that the experts were "mercenary soldiers" and "prostitutes." *Id.* at 470. In finding reversible error, the court concluded that the prosecutor's remarks were based on facts not in evidence, that the remarks played impermissibly on the prejudices of the jurors, introducing irrational and irrelevant elements into the trial, and that the comments unfairly struck at the heart of the defendant's case (lack of criminal responsibility). *Id.* at 470-471.

Here, the prosecutor's comments did not go beyond the evidence, did not introduce irrational and irrelevant elements, and did not strike at the heart of the defendant's case. The prosecutor's remarks, taken in context, were directed not at the defendant's expert but at the expert's assertion that only a left-handed person could have committed the murder. The prosecutor was properly urging the jury to reject the testimony of the defendant's expert in light of the Commonwealth's expert testimony to the contrary and asking that they resolve conflicting testimony by using their common sense. See *Commonwealth* v. *Shea*, 401 Mass. 731, 739 (1988). There was no impropriety.

---

[8]"But, ladies and gentlemen, don't get confused with left, right. There is no question. Wounds were inflicted. Use your common sense. Do you think [the defendant's doctor] would have come down here if he was going to tell you that it was a right-handed person and he didn't have any blood on him?"

3. *Jury instructions.* The defendant argues for the first time on appeal that the judge did not instruct the jury adequately on the issue of intoxication. At the Commonwealth's request, the judge instructed the jury that they could consider any evidence pertaining to the defendant's voluntary intoxication as negating the specific intent necessary for malice in murder. The defendant maintains that the judge's failure to give a similar instruction as to the elements of extreme atrocity or cruelty, deliberate premeditation, and felony-murder may have led the jury to believe that voluntary intoxication was not relevant to those elements. He also maintains that the judge's instruction should have been extended to the so-called "third prong" of malice.[9] See *Commonwealth* v. *Sylvester*, 400 Mass. 334, 336 (1987); *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 & 472 n.4 (1987). No objection was made to the instructions given nor were any additional instructions requested.

We conclude that the defendant's present contentions are groundless. The defendant never raised these points at trial. The only live issue was the identity of the murderer, and no challenge was made to the fact that the Commonwealth's evidence established the commission of an armed robbery and first degree murder. See *Commonwealth* v. *Bembury*, 406 Mass. 552, 562-563 (1990); *Commonwealth* v. *Freiberg*, 405 Mass. 282, 287 (1989); *Commonwealth* v. *Lawrence*, 404 Mass. 378, 395 (1989); *Commonwealth* v. *Griffith*, 404 Mass. 256, 260 (1989); *Commonwealth* v. *Fano*, 400 Mass. 296, 305-306 (1987); *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 4-5 (1986); *Commonwealth* v. *Gil*, 393 Mass. 204, 220-221 (1984). Further, the instructions given were more favorable than what the evidence required, because, although

---

[9]The malice aforethought necessary for murder can be established by proof of either an actual intent to kill the victim or to do the victim grievous bodily harm. In addition, malice may be found by inference from the defendant's commission of an act which a reasonably prudent person would know is likely to result in the death of another. See *Commonwealth* v. *Grey, supra.* This latter method of establishing malice is sometimes referred to as the third prong of malice.

there was some evidence that the defendant had consumed alcohol on the night of the murder, there was no evidence that the alcohol had any effect on the defendant's state of mind. See *Commonwealth* v. *Freiberg, supra* at 287. Finally, the judge did not preclude the jury from considering evidence of intoxication in deciding first degree murder. See *Commonwealth* v. *Freiberg, supra* at 288; *Commonwealth* v. *Fano, supra* at 308 n.17. Although the judge did preclude the jury from considering evidence of intoxication on the third prong of malice, see note 9, *supra*, his instruction was sound. *Commonwealth* v. *Grey, supra* at 472 n.4. See *Commonwealth* v. *Troy*, 405 Mass. 253, 260 (1989); *Commonwealth* v. *Glass*, 401 Mass. 799, 809-810 (1988). In view of the fact that the victim was stabbed nine times in the chest and back with a seven inch long knife, sustained two fractures of the skull, and received other serious injuries, the case was clearly not a "third prong" malice case. *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5-6 (1986). The judge committed no error.

4. *G.L. c. 278, § 33E*. Having reviewed the entire record in fulfilment of our duty under G. L. c. 278, § 33E, we find no reason to disturb the verdict of murder in the first degree.

*Judgments affirmed.*