COMMONWEALTH vs. WILLIAM R. MITCHELL.

No. 93-P-1081.

Essex. September 8, 1994. - February 28, 1995.

Present: PERRETTA, IRELAND, & GREENBERG, JJ.

*Practice, Criminal,* Preservation of evidence, Loss of evidence by prosecution, Instructions to the jury. *Evidence,* Scientific test, Prior inconsistent statement, Impeachment of credibility. *Malice. Intoxication.*

At a murder trial the defendant's motion for a mistrial was correctly denied where he did not establish that testing of blood on the handle of the murder weapon for comparative serology or deoxyribonucleic acid analyses would have produced potentially exculpatory evidence [190-191]; moreover, any showing of an absence of the defendant's blood on the knife handle was marginally material [191]; further, the record did not support the claim that the Commonwealth was culpable for the failure to have conducted the testing [191-193]; and finally, in light of the abundance of evidence that the defendant stabbed the victim there was no substantial risk that the jury would have reached a different conclusion if the analyses had shown an absence of the defendant's blood on the knife handle [193-194].

There was no error in the prosecutor's closing argument at a murder trial which responded to defense counsel's closing argument regarding inferences from the evidence. [194]

There was no error at a criminal trial in the judge's limiting evidence of certain prior inconsistent statements to the issue of the witness's credibility, where the defendant did not seek to use the statements for any other purpose and where, in any event, the judge in his charge to the jury treated the evidence as having probative value. [194-195]

There was no error at a criminal trial in the judge's allowing a witness whose credibility was impeached with prior inconsistent statements to explain why he had made the inconsistent statements. [195-196]

At a murder trial, error, if any, in the judge's instruction to the jury that precluded their consideration of the defendant's intoxication on the third prong of malice did not create a substantial likelihood of a miscarriage of justice, where the evidence of the defendant's conduct supported the inference of such malice and there was no evidence of debilitating intoxication. [196-198]

INDICTMENT found and returned in the Superior Court Department on May 23, 1990.

The case was tried before *Patrick F. Brady*, J.

*John M. Thompson* for the defendant.

*Elin H. Graydon*, Assistant District Attorney (*D. Dunbar Livingston*, Assistant District Attorney, with her) for the Commonwealth.

PERRETTA, J. When Jeffrey Teague returned to his motel room and learned that he had been evicted because of damage done in his absence by the defendant, he and three of his friends went to an apartment where the defendant was staying. A fight ensued, and Teague was stabbed to death. The defendant's principal claim on appeal from his conviction of murder in the second degree is that the Commonwealth violated his right to a fair trial by the manner in which its agents conducted scientific tests on the murder weapon. He also alleges error in the trial judge's evidentiary rulings and jury instructions. We affirm the conviction.

1. *The evidence.* There was evidence to show that on April 25, 1990, at about 8 P.M., a number of Teague's friends gathered in his motel room at Salisbury Beach to play cards and watch television. At some point in the evening, Teague put one of his friends, Willard True, in charge of the room and left for a short time. Almost as soon as Teague left, the defendant arrived. He had a hammer stuck in the waist band of his trousers. About fifteen minutes after his arrival, the defendant and True became involved in an argument, and True told him to leave. As he left the room, he smashed a window with the hammer he was carrying.

About ten minutes after the defendant left, Teague returned and was informed by his landlord that, because of the damage to the window, he would have to vacate the premises. Teague became angry and went across the street to the apartment of a friend, Rick Bouffard, to see if he knew where the defendant had gone. Teague's friends, Allen King, Bill Cristoldi, and Sean Riley, followed him. Meanwhile, True was sitting with his girlfriend in her car which was parked near the motel. Teague knocked on the main door of

the building, but no one responded. He finally gained access through the rear of the building and returned to the front to admit his friends.

Once in the building, the four men went up a flight of stairs and down a dimly lit hallway to the apartment in which, they believed, they would find the defendant. There is some conflict in the testimony as to whether Teague tried to force the lock on the door or whether he knocked. The defendant opened the door a few inches, and Teague demanded entrance, saying he wanted to talk to him. The defendant released the chain lock, opened the door, and came at Teague swinging two knives. Teague was stabbed several times in his chest and numerous times in one leg. When the defendant stepped back, Teague's friends pulled him (Teague) away and helped him down the stairs and out the building where he collapsed and soon died.

Riley, who had seen the defendant wielding a knife during the fight, ran to the police station; Cristoldi went to the house of a local police officer; and King remained with Teague, trying to stop the bleeding from his leg. He heard noise, looked up, and saw the defendant running down the street. True was now out of the car in which he had been sitting and was pursuing the defendant, who threw away a steak knife as he fled. True retrieved the knife but later dropped it during the chase. He was able to catch and confront the defendant in a back alley. The defendant was holding a long knife which he dropped when True threw metal rubbish barrels at him. The two began to fight. True was banging the defendant's head to the ground repeatedly when a woman stopped the beating by threatening to unleash her dog on True. The defendant ran off.

When the police arrived, True showed them where he had last seen the knives and the defendant. The police took the knives and found the defendant in a nearby house. They arrested him and brought him to the hospital. He was intoxicated, and there was blood on his face, clothing, and hands.

2. *Scientific testing of the weapon.* When the police arrived on the scene, they retrieved the two knives and various

articles of clothing which were turned over to the State crime laboratory. Although both knives were found, only one is here in issue: the large knife which the defendant dropped on the ground during his fight in the alley with True.

We learn from the police reports provided the defendant by discovery that the State crime lab took swatches, or swabbings, of the blood found on the articles of clothing and the knife. Although this report indicates that there was blood on the handle and the blade of the knife, the report does not specify from which part of the knife the swatch was taken. The report does go on to advise that the swatches, that is, the specimens, would be retained by the serology section of the State crime lab in the event of a request for a "comparative analysis." Such a request, however, would have to be accompanied by "appropriate standards from both the victim and the suspect." A report from the photograph and fingerprint section of the State police advises that the knife was next processed for latent fingerprints, but none could be identified.

Several months later, on October 30, 1990, the State crime lab filed a supplemental report. This report reveals that blood specimens from Teague and the defendant had been sent to the lab with a request for a comparative serological analysis of the specimens earlier taken from the clothing and the knife. Although certain findings were made in respect to the swatches taken from the items of clothing, a comparative analysis was not done on item "2. Large carving knife — human bloodstain swatch" because of the "limited amount of [the] sample." The report further advised that "any grouping tests conducted on this item will result in exhaustion of the specimen."

About two months after this report was filed, defense counsel filed a motion seeking funds to retain an independent serologist to examine the findings made by the State crime lab and, if necessary, to retain a deoxyribonucleic acid (DNA) expert.[1] At the hearing on this motion, defense counsel argued that he wanted all the items referred to in the

---

[1]Appellate counsel was not trial counsel.

State crime lab reports sent to his proposed DNA expert in California. Throughout this hearing, the prosecutor and defense counsel referred to item two as either "item two" or the "knife." The Commonwealth was reluctant to relinquish possession of its evidence, especially in light of the fact that any testing of item two would be, as noted in the State crime lab report, destructive, and the motion judge was concerned about the expense. The prosecutor and defense counsel then agreed that the items would be put to DNA testing by the Federal Bureau of Investigation (FBI).

Shortly after the hearing on the motion, the prosecutor wrote to the State crime lab and requested that it send specified items to the FBI lab. In making this request, the prosecutor identified the items to be sent by reference to their numbers used in the State lab's serology reports. In respect to the knife, the prosecutor's request for transmittal was accordingly directed to "2. Large carving knife — human blood stain." A copy of this letter was sent to defense counsel.

Four months later, on April 25, 1991, the FBI forwarded its report to the State crime lab. The first page of the report specifies the seven "specimens received" from the State crime lab. Each of those seven items was either a "cutting" or "swabbing" from an article of clothing or other particularized item. As acknowledged in the report, it had received a "swabbing from knife" rather than the knife itself. The DNA testing of the knife swatch showed a match with Teague's blood. Defense counsel had the FBI report on or before October 29, 1991, the date of a hearing on the Commonwealth's motion seeking a pretrial determination that the DNA test results would be admissible at trial.

As earlier noted, when the knife was first taken to the State crime lab, there was blood on the handle and the blade. In the course of presenting its case at trial, the Commonwealth's expert witnesses expanded upon the testing procedures they had employed on the knife. There was testimony to show that the blood on the blade of the knife was removed on a swatch. No blood was taken from the handle because

the knife was also going to be processed for fingerprints. The removal of blood from the handle would have destroyed any fingerprints. The handle was tested for fingerprints by use of the "super glue process." Because this process contaminated the blood on the handle, it was thereafter impossible to ascertain the origin of that blood by serology grouping tests. When the DNA expert for the FBI testified that the State crime lab sent her the swatch from the knife and not the knife itself, defense counsel sought a mistrial.

It was the position of defense counsel that he had structured his defense on the theory that as the defendant had cut his hands when he earlier broke Teague's window with the hammer, his blood would be on the handle had he held the knife to stab Teague.[2] For that reason, he had requested DNA testing of the knife and had asked that the knife be sent to the FBI. When the FBI report came back silent as to the presence of the defendant's blood on the knife, he went forward with the defense that Teague had to have been stabbed by someone other than the defendant, specifically, William True.[3] Defense counsel insisted that the prosecutor's late disclosure of the fact that the knife had not been sent to the FBI for DNA testing had so undermined the defense that a mistrial was necessary.[4]

After reviewing the written laboratory reports and the transcript of the hearing on the defendant's motion for funds for independent testing, the trial judge ruled that the matter was of little consequence in that the absence of the defendant's blood on the knife would not necessarily show that he had not held it. He concluded that it was defense counsel's burden to make a clear and unambiguous request for DNA testing on the knife handle and that the prosecutor had not intentionally deprived him of the evidence. He also found

---

[2]There was some testimony that after breaking the motel window with the hammer, the defendant's hands were bleeding.

[3]This defense was never expressly announced to the jury. Defense counsel reserved and then waived his right to make an opening statement.

[4]The request for a mistrial was made in the alternative. Defense counsel also moved for dismissal of the indictment, but relief from the denial of that motion is not pursued on appeal.

that the defendant was not prejudiced by the absence of DNA test results as he was free to argue to the jury that the Commonwealth had failed to produce any evidence that his blood was on the handle and had it been, the Commonwealth would have tested for it.

3. *Denial of the motion for a mistrial.* It is the defendant's argument that he is entitled to a new trial because the Commonwealth denied him due process by "improperly contaminating a crucial bloodstain," by "thwarting defense efforts to type that blood," by "misleading defense counsel regarding the results of blood type testing done on the knife," and by "arguing in summation that the blood on the knife handle was the defendant's." The record does not support these claims. "In this Commonwealth, when potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). This weighing test, however, does not come into play until the defendant meets his "initial burden of establishing a reasonable possibility, based on concrete evidence and not on mere speculation, that the Commonwealth's actions deprived him of evidence that would have been favorable to his case." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 714 (1993).

Whether the evidence was potentially exculpatory is an issue which we consider in the context of the theory of defense which the defendant claims was undermined by the Commonwealth. The defendant argues that "it was clear a year before trial that one of the defense strategies was to argue that the knife was wielded by Will True rather than William Mitchell" and that the absence of the defendant's blood on the knife would have supported this theory. This argument overlooks that there was no evidence from which the jury could directly find or reasonably infer that William True was even present in the hallway when Teague was stabbed. Disbelief of the testimony of the Commonwealth's several wit-

nesses who stated that True was sitting in a car with his girl-friend at the time would not constitute evidence of his presence in the hallway. See *Commonwealth* v. *Marino*, 343 Mass. 725, 728 (1962); *Commonwealth* v. *Michaud*, 389 Mass. 491, 498 (1983). Further, and as noted by the trial judge in denying the defendant's motion for a mistrial, an absence of the defendant's blood on the knife would not compel the conclusion that he had not held it. Moreover, although one witness, John F. Koney, testified that immediately before the fight in the hallway the defendant's "wrists were blood-drenched," the jury could have deemed that witness not credible, see part four of this opinion *infra*, and have found, to the contrary, on the basis of medical testimony showing that when the defendant was treated at the hospital after his arrest, there were only "several little scratches and superficial cuts on the top of both hands." Based upon the abundance of evidence showing that the defendant stabbed Teague and the absence of evidence to show that True was even present at that time, we conclude that the defendant is not entitled to the presumption that potentially exculpatory evidence had been lost. See *Commonwealth* v. *Olszewski*, 416 Mass. at 714-715. Compare *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15, 22-23 (1993).

Even had the defendant established a reasonable possibility that DNA testing of the knife would have produced potentially exculpatory evidence, our conclusion would be no different under the balancing test required by *Commonwealth* v. *Willie*, 400 Mass. at 432-433. In weighing the components of this test, we think it unnecessary to discuss the materiality of the DNA test results. It follows from what we have already stated in respect to the potentially exculpatory nature of that evidence, that we also think that any showing of an absence of the defendant's blood from the knife would be of marginal materiality.

We consider the culpability of the Commonwealth in failing to subject the blood on the handle to the knife to either serology or DNA testing. At the time of the defendant's arrest, the police had retrieved two knives, witnesses to the

fight had told them that the defendant had stabbed Teague, and the defendant had made statements which could be construed to mean that he had stabbed Teague, albeit in self-defense.[5] These circumstances would make it reasonable to conclude that it might be important to ascertain which of the knives had been used to inflict the fatal wounds and to secure proof that the defendant had wielded it.

Although the defendant points to *Commonwealth* v. *Phoenix*, 409 Mass. 408, 411 (1991), as authority for the proposition that the handle could have been processed for fingerprints without contamination of the blood stain, it does not follow that the State crime lab acted improperly in using the super glue process. Although the laser process described in *Phoenix* was available to the Connecticut authorities, there is nothing in the record before us to show that effective alternative fingerprint testing methods which would not contaminate or otherwise disturb the blood stain were here available to the police. Moreover, although the police intentionally employed the super glue process which made serology testing of the blood thereafter impossible, there is nothing in the record to show whether the exposure of the blood on the knife handle to super glue during the fingerprinting process precluded subsequent DNA testing of that blood by the defendant.[6] See *Commonwealth* v. *Neal*, 392 Mass. 1, 7-9 (1984).

Also without record support are the allegations that the Commonwealth "thwarted" the defendant's efforts to type the blood on the knife by failing to send either the knife itself or a swatch of blood from its handle to the FBI and thereafter misled defense counsel as to the blood type test results. As can be seen in our discussion of the circumstances of the serology and DNA testing of the knife, defense counsel did

---

[5]More specifically, the defendant stated that, "It was not my fault. I can take on anyone, any man, one on one." Although these statements were ultimately suppressed (the motion was heard and decided the first day of trial immediately after the jury were empaneled) because of the defendant's intoxication at the time of his arrest, we think it permissible to consider them in respect to the limited issue of whether the Commonwealth's actions entitle the defendant to a new trial.

[6]The defendant concedes this point in his brief.

not specify, in either his motion for DNA testing or during argument on that motion, that he wanted the blood on the handle tested and, instead, he spoke in terms of the "knife." The prosecutor spoke in interchangeable terms of the "knife" and "item 2," which, as previously identified in the serology reports, was the "large carving knife — human bloodstain swatch." The prosecutor also expressed his preference that the testing be done by the FBI rather than by defense counsel's proposed expert because, as noted in the serology report, additional testing of the "knife" would be "destructive." The serology report advises: "No grouping tests were conducted on the human blood removed from the large carving knife (Item 2), at this time due to the limited amount of sample. Please note that any grouping tests conducted on this item will result in exhaustion of the specimen."

Even assuming that the previously provided serology reports and the prosecutor's references were not yet sufficient to alert defense counsel to the need for greater specificity, it was clear from the FBI report of the DNA testing that a swabbing from the knife and not the knife itself had been sent to the FBI and that the blood on the swabbing matched the blood of the victim. As earlier noted, defense counsel had the FBI report no later than October 29, 1991, the date of the pretrial hearing concerning the admissibility of those test results.

These facts show, at best, a genuine misunderstanding on the part of the prosecutor as to the exact substance defense counsel sought to have tested. If we must allocate responsibility for that misunderstanding, defense counsel must accept a large portion. Cf. *Commonwealth* v. *Jackson*, 388 Mass. 98, 110 (1983).

"Where destroyed evidence is determined to be material, it is nevertheless unlikely that the prejudice to the defendant would be high where there is additional sufficient evidence upon which to convict him." *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. at 26. For reasons previously discussed, we see no substantial risk that, as the defendant claims, the jury would have reached a different conclusion if evidence show-

ing an absence of the defendant's blood from the knife handle had been presented at trial. See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 412-414 (1992).

Additionally, and as noted by the trial judge, the defendant was free to state in his closing argument that the Commonwealth had failed to present any evidence showing the presence of his blood on the handle. See *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 308 (1979). The defendant not only made that argument, he went further and stated, over objection, that the Commonwealth's experts testified that they could find blood anywhere with DNA testing, thereby creating the inference that the defendant's blood was not found because it was not on the handle. That inference was far more favorable than what the evidence reasonably would permit. Compare *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 24 (1987), where it was held that although reasonable doubt could be inferred from the absence of a test report, such an inference was an inadequate substitute for *existing* evidence which would have shown, had it been disclosed, material scientific test results which in fact exculpated the defendant.

Further, because defense counsel's closing argument cannot be viewed as a remedy necessitated by misconduct on the part of the Commonwealth in respect to the DNA testing, see *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. at 27, the prosecutor was free to respond and argue to the jury that, based upon the evidence which included the circumstances of the scientific testing, they should instead infer that the blood on the knife handle belonged to the defendant. See *Commonwealth* v. *Chavis*, 415 Mass. 703, 713-714 (1993).

4. *Evidentiary rulings.* In arguing that the trial judge erred in limiting evidence of Sean Riley's prior inconsistent statements to the issue of his credibility, see *Commonwealth* v. *Daye*, 393 Mass. 55, 65-75 (1984), the defendant does not take into account the fact that defense counsel never sought to use the statements for any purpose other than impeachment. That the statements were intended for their impeachment value only is further demonstrated by the fact that de-

fense counsel took no objections to the trial judge's contemporaneous limiting instructions.

Moreover, even were we to conclude that it was somehow error to limit the use of the statements, we would find no substantial risk of a miscarriage of justice. The substance of the inconsistent statements was to the effect that Teague tried to force open the door to the defendant's apartment with a butter knife. The defendant argues that had those statements been admitted for their substantive value, they would have shown that Teague was an intruder. Assuming that to be so, we note that the trial judge, in his charge to the jury on self-defense, treated the evidence as having probative value and instructed more than once that "an occupant of a dwelling has no obligation to retreat from a person who is unlawfully in that dwelling."

Nor do we see reversible error in the trial judge's decision that John Koney, whose credibility was impeached with his prior inconsistent statements, could explain why he had previously lied to the police.[7] Defense counsel was put on notice at a side bar conference that if impeached, Koney could explain that he had lied to the police out of fear of the defendant who had stabbed him just a few months earlier. Defense counsel, claiming that the probative value of the explanation was outweighed by its potential for prejudice, unsuccessfully sought to limit the explanation to the fact that Koney and the defendant simply had a fight.

Aware of the trial judge's ruling, defense counsel impeached Koney with his prior inconsistent statement to the police. Koney's credibility was important to the Commonwealth as his testimony was strong support for its theory of murder in the second degree. In explaining the circumstances of the earlier incident, Koney related that there had been a fight during which the defendant held a knife to the throat of

---

[7]Although Koney told the police that he had not seen the fight between the defendant and Teague, he testified at trial that he was in the hallway and saw the following: "The door opened, and immediately Mr. Mitchell had two weapons in his hands, at about mid-waist. And, when the door opened, within a matter of seconds, he came out swinging with underthrusts, with two knives in his hands, at Jeff."

Koney's brother. Koney charged at him, and the defendant "grazed" Koney's shoulder with the knife. Immediately prior to this testimony, the trial judge instructed the jury that the evidence of this incident could be used only in considering the issue of Koney's credibility. There was no error. See *Commonwealth* v. *Errington*, 390 Mass. 875, 880-882 (1984).

5. *The jury instructions.* Of the numerous complaints concerning the trial judge's jury instructions, to which no objections were taken, only one warrants some discussion. Evidence was presented to the jury concerning the defendant's intoxication at the time of his arrest. When the arresting officers were asked about the defendant's sobriety at that time, each expressed the opinion that he was "intoxicated." In charging the jury on malice, the trial judge instructed that the defendant's intoxication could be considered only in respect to his ability to formulate a specific intent to kill the victim or to do the victim grievous bodily injury but that intoxication was irrelevant to the third prong of malice. See *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987).

In reliance upon *Commonwealth* v. *Moore*, 408 Mass. 117, 135 (1990), the defendant claims that because of the number of stab wounds inflicted upon Teague, "[n]o conduct was attributed to . . . [the defendant] which would support a finding that he acted with less than specific intent to kill or inflict serious bodily harm, unless his degree of intoxication is taken into account." By instructing as he did, the argument continues, the trial judge provided the jury with an opportunity to consider malice without regard for the defendant's state of "extreme intoxication."

There is no support in *Moore* for the defendant's argument. There the victim was bound and gagged, stabbed nine times in the chest and back with a seven inch long knife, and he sustained numerous other serious injuries, including two skull fractures. The defendant claimed error in the jury instructions concerning the effect of his intoxication in respect to third prong malice. There were two bases for the court's rejection of the claim. First, the "only live issue was the iden-

tity of the murderer, and no challenge was made to the fact that the Commonwealth's evidence established the commission of an armed robbery and first degree murder." *Id.* at 134. Second, "although there was some evidence that the defendant had consumed alcohol on the night of the murder, there was no evidence that the alcohol had any effect on the defendant's state of mind." *Id.* at 134-135. In this context, the court stated that the "case was clearly not a " 'third prong' malice case," *id.* at 135, and pointed out that the instructions,[8] on the law and evidence presented, were to the defendant's advantage and not prejudice.

We see no error, let alone a substantial risk of a miscarriage of justice, in allowing the instant jury to infer malice if they found that "in the circumstance known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Grey*, 399 Mass. at 470 n.1. Evidence was presented to the jury to show that Teague knocked on the apartment door demanding to speak to the defendant. The defendant opened the door and went at Teague, swinging two knives in "under-thrust" motions. The jury could reasonably infer malice from those acts. See *Commonwealth* v. *Swift*, 382 Mass. 78, 83 (1980).

Further, there was no evidence of the defendant's "debilitating intoxication" that required an instruction consistent with *Commonwealth* v. *Sama*, 411 Mass. 293, 298-299 (1991), decided one month after the verdict. The defendant's characterization of the state of his intoxication is based upon the trial judge's ruling allowing his motion to suppress the statements he made to the police at the time of his arrest after receiving his *Miranda* warnings. At the evidentiary hearing on that motion, police officers testified to the fact that the defendant was "drunk," "intoxicated," and "under the influence of alcohol" at the time of his apprehension. In allowing the motion, the trial judge stated that the defendant

---

[8]The instructions did include a reference to intoxication and specific intent malice.

"was not responding to anything that anyone asked him; he was simply out of control by virtue of intoxication *and* injury, as well as *perhaps* a mental state that may have been the product of the events of that evening" (emphasis supplied). At trial, the officers testified to no more than the fact that the defendant was under the influence of alcohol and that he was "intoxicated" at the time of his arrest. If it was error to preclude the jury from considering the defendant's intoxication under third prong malice, that error did not create a substantial risk of a miscarriage of justice requiring reversal of the defendant's conviction. See *Commonwealth v. Sires*, 413 Mass. 292, 299 (1992); *Commonwealth* v. *Pierce*, 419 Mass. 28, 38-39 (1994). Compare *Commonwealth* v. *Sama*, 411 Mass. at 299; *Commonwealth* v. *McLean*, 32 Mass. App. Ct. 978, 979 (1992).

*Judgment affirmed.*