**Kurt G. BROWN, Petitioner**

v.

**Steven O'BRIEN, Respondent.**

**Civil Action No. 08–11293–JLT.**

United States District Court,
D. Massachusetts.

June 1, 2009.

138

Eva M. Badway, Attorney General's Office, Boston, MA, for Respondent.

Richard L. Goldman, Orlen & Goldman, Florence, MA, for Petitioner.

### ORDER

TAURO, District Judge.

This court ACCEPTS and ADOPTS the May 1, 2009 Report and Recommendation [# 18] ("Report and Recommendation") of Magistrate Judge Dein. For the reasons set forth in the Report and Recommendation, this court hereby orders that:

1. The *Petition for Writ of Habeas Corpus* [# 1] is DENIED.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254*

DEIN, United States Magistrate Judge.

### I. *INTRODUCTION*

On November 14, 2005, following a jury trial in Barnstable Superior Court, the petitioner, Kurt G. Brown ("Kurt" or the "petitioner"), was found guilty as a joint venturer with his brother Kevin and his co-defendant Christopher Glover of armed assault with intent to rob and possession of a firearm. On November 15, 2005, the trial judge, Connon, J., entered a required finding of not guilty on the firearm charge, and sentenced the petitioner to a term of a minimum of six years and a maximum of seven years on the armed assault conviction. The petitioner appealed, arguing that the trial judge had erred in denying his motion for a required finding of not guilty because the evidence was insufficient to prove that he was one of the perpetrators of the armed assault. His conviction was affirmed by the Massachusetts Appeals Court in an unpublished memorandum and order issued pursuant to Rule 1:28. *Commonwealth v. Brown,* 68 Mass.App.Ct. 1113, 863 N.E.2d 95 (2007). His application for leave to obtain further appellate review was denied by the Massachusetts Supreme Judicial Court on May 2, 2007 without opinion. *Commonwealth v. Brown,* 449 Mass. 1102, 865 N.E.2d 1140 (2007) (table). This habeas petition pursuant to 28 U.S.C. § 2254 was timely filed.

By his habeas petition, Kurt contends that his right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution was violated because the Commonwealth failed to prove beyond a reasonable doubt that he was the individual who participated in the armed robbery. There was no direct identification of the petitioner and his conviction was based on circumstantial evidence. Kurt further contends that he is entitled to a *de novo* review of his claim. The Commonwealth argues that the evidence was sufficient, and that the appropriate standard of review is whether the Appeals Court's decision was contrary to or an unreasonable application of Supreme Court law, or whether it was based on an unreasonable determination of the facts in light of the evidence presented.

For the reasons detailed herein, this court finds that whether or not the review is *de novo,* there is sufficient evidence for the jury to have found that the Commonwealth met its burden of proof beyond a reasonable doubt. Therefore, this court recommends to the District Judge to whom this case is assigned that the petition under 28 U.S.C. § 2254 for a writ of habeas corpus (Docket No. 1) be DENIED.

## II. *STATEMENT OF FACTS* [1]

### *Scope of the Record*

In reviewing a habeas petition, the state trial and appellate courts' findings of facts are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Norton v. Spencer,* 351 F.3d 1, 6 (1st Cir. 2003) (quoting *Sumner v. Mata,* 455 U.S.

591, 592–593, 102 S.Ct. 1303, 1304, 71 L.Ed.2d 480 (1982)); *Rashad v. Walsh,* 300 F.3d 27, 35 (1st Cir.2002). The petitioner has the burden of overcoming the presumption by "clear and convincing evidence." *Teti v. Bender,* 507 F.3d 50, 57 (1st Cir.2007) (quoting 28 U.S.C. § 2254(e)(1)). In the instant case, however, neither the trial judge nor the Appeals Court made express findings of fact. Rather, in affirming the conviction, the Appeals Court ruled, in its entirety:

> The defendant, Kurt G. Brown, appeals from a jury verdict of guilty on charges of armed assault with intent to rob, G.L. c. 265, § 18(b), and possession of a firearm, c. 269, § 10.[2] We conclude that the evidence was sufficient, when viewed in the light most favorable to the Commonwealth, for a rational trier of fact to find that the defendant was guilty beyond a reasonable doubt. See, e.g., T. 2/137, 234; 3/162–164, 171, 186, 199, 215, 219–220, 227, 234, 324–325, 345; 4/379, 392, 487–488.

Ex. F. As detailed below, these record citations are to the key testimony supporting Kurt's conviction. However, there are no descriptive findings of fact to which this court could defer.

▇▇▇ The parties agree that in reviewing Kurt's claim that the evidence was insufficient to support the verdict, the appropriate standard "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See generally* Pet. Mem. (Docket

---

1. The record below, including transcripts, has been filed as a Supplemental Answer ("SA") and docketed as Docket No. 8. Citations will be to "Ex. ― at ―."

2. The Appeals Court was in error when it stated that the appeal was from a conviction of possession of a firearm; a required finding of not-guilty on that charge had been entered by the trial judge.

No. 13) at 21–24. Put another way, a petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324, 99 S.Ct. at 2791–92. The prosecution is not "under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt[.]" *Id.* at 326, 99 S.Ct. at 2792–93. "[I]t is enough that all 'reasonable' doubts be excluded." *Stewart v. Coalter*, 48 F.3d 610, 616 (1st Cir.1995). Therefore, this court will review the evidence in the light most favorable to the Commonwealth. For the most part, the underlying facts are not in dispute.

### The Assault

The charges that resulted in the petitioner's conviction arose from an incident at the Knights of Columbus hall in Hyannis, Massachusetts, on the night of July 12, 2003. *See* Pet. Mem. (Docket No. 13) at 2–3. Thomas Trott, a Vietnam veteran, his brother Richard, and his wife Susan, ran a weekly bingo game on Saturday nights at the hall for the Disabled Veterans Association. Ex. M at 87–89. About 150 to 170 people attended the bingo game regularly. Ex. M at 135. A majority of the patrons were couples over 65 years old. Ex. N at 196.

On Saturday nights, Richard Trott also ran a jackpot game that was separate from the bingo game. *See* Ex. N at 223–24. Richard sold tickets to the jackpot game each week during the bingo game, and for each week without a jackpot winner, the prize would grow and carry over to the following week. *Id.;* Ex. M at 134. In two or three months, the jackpot could reach $5,000. Ex. M at 134. On the night of the incident, the jackpot was over $3,000. Ex. N at 224.

July 12, 2003 was a hot day. Ex. M at 139–40. Because the hall would get stuffy, the patrons generally wore light clothing. *See* Ex. M at 140. Around 10:00 p.m. that night, Thomas Trott left the hall to get something from the saddlebag on his motorcycle when he noticed two men standing behind a nearby tree. *See* Ex. M at 90–91. He said "Halt, who goes there?" They replied that they were "taking a leak." *Id.* Thomas went back inside, and shortly thereafter, emerged again to get something from his motorcycle. Ex. M at 91. He could still see two people behind the trees, and it looked to him like they were wearing masks. *Id.* Thomas walked toward the trees to see what the two were doing, and they came out from behind the trees. Ex. M at 91–92. One of the men was holding a shotgun that he pointed at Thomas and said, "You're dead." *Id.*

Thomas immediately started backing up towards the building. Ex. M at 92. He turned to see where his brother Richard was, when one of the men hit him on the left side of the face with the shotgun, breaking off the stock of the gun. Ex. M at 92–93. Thomas fell to his knees. Ex. M at 93. The man with the gun then hit him several times in the head and on the side of his body with the barrel of the gun. *Id.* Thomas lay just outside the doorway leading into the building. Ex. M at 93–94. He was in so much pain during the beating that he could not speak or move. Ex. M at 94. As a result of his injuries, Thomas was hospitalized for about a week; he had cuts on his face that needed stitches. Ex. M at 98. He also had broken ribs and an injury to his spleen. *Id.*

When the police arrived, Thomas described the two men as young, between 18 and 20 years old, with blond hair, weighing approximately 150 to 160 pounds. *See* Ex. M at 94–97, 127. He estimated that the man wielding the gun was 5'7" or 5'8" tall,

while the other man was taller, 5'8" or 5'9". *See* Ex. M at 94.[3] Thomas could only see his assailants' eyes, and told the police that his assailant was wearing a dark mask, but he could not describe his clothing. Ex. M at 94–95.

Karen Trott, Richard's daughter, was also helping out at the bingo game that evening. Ex. N at 156–57. She was leaving the bingo hall when she saw her uncle Thomas on the ground being tackled by two men. Ex. N at 158. Thomas was yelling for help as one of the men hit him with the barrel of a gun. Ex. N at 158–59. Karen ran inside to enlist her father's help. Ex. N at 159. She observed the unarmed assailant run inside the bingo hall towards the office where the money was kept, then, upon seeing Richard, run back outside to the rear of the parking lot where a vehicle waited. Ex. N at 159–161, 164. She saw Richard chase both men across the parking lot and threaten to fire an imaginary gun at them as they neared the vehicle. Ex. N at 165–66. The armed assailant threw the shotgun into the woods as both men jumped into the waiting vehicle, a red Jeep. Ex. N at 166. Karen identified both men as wearing dark clothing. Ex. N at 162–164, 181–82. She testified that the unarmed assailant who had entered the building was wearing a dark, light-weight jacket with a dark band or stripe down the sleeve, dark pants and a dark mask. Ex. N at 162–63, 180–81, 186. He was white, and approximately 5'7" or 6' tall. Ex. N at 163. The assailant was also wearing a dark jacket, pants and a mask. Ex. N at 163–64. She was unable to see whether the Jeep contained a third person, but testified that it was already running when the two men jumped in, and that it drove away immediately. Ex. N at 167.

Richard Trott testified that he heard Karen scream and saw a man in dark clothing enter the bingo hall. Ex. N at 198–99. Richard saw Thomas on the ground wrestling with another man outside the door, and ran to his aid. Ex. N at 199. The assailant who had just entered the bingo hall, now turned around and ran out of the hall, grabbing the other assailant as the two began fleeing across the parking lot. Ex. N at 199–200. Richard ran after the two men. *Id.* As Richard chased the assailants across the parking lot, he noticed the Jeep with the back door open, interior light on, and someone waiting inside. Ex. N at 200–01. Richard threatened to shoot, believing that it was too dark for anyone to notice whether or not he actually possessed a gun. Ex. N at 201. The men jumped into the back seat of the Jeep and it drove onto Route 28 towards Centerville. Ex. N at 201–02. Richard could not identify the driver of the Jeep but testified that it was not one of the two assailants who he chased to the car. Ex. N at 202. According to Richard, the man who entered the building was taller than the other man. He estimated the man with the gun hitting Thomas as about 5'6" or 7" tall, and the man who ran into the building around two or three inches taller. Ex. N at 214–15. Both men were wearing dark clothing and dark ski masks. Ex. N at 215–16.

Thomas' wife, Susan, was the bookkeeper for the bingo games and was responsible for counting the money, distributing prizes and filling out the forms that needed to be filed with the state Lottery after each game. Ex. M at 132–34. She testified that she saw Thomas wrestling with someone dressed all in black, who had on a mask of some sort, and a hood over his head. Ex. M at 143. He was wearing a

**3.** As detailed *infra,* Thomas later identified the petitioner's brother, Kevin Brown, as the person who assaulted him with the gun that night. *See* Ex. O at 523–25, 530.

big, black bulky sweatshirt, black sweatpants, and his face was covered. Ex. M at 144. Based on his agility, Susan told the police that she believed the person attacking Thomas was in his 20's or 30's. Ex. M at 145.

The stock of the shotgun was found on the ground at the bottom of the steps to the hall. Ex. N at 213. With the assistance of their tracking dog, the police found the barrel of the shotgun lying in a grassy area near the wood line. Ex. N at 320–21. They found the Jeep abandoned about one-half mile from the bingo hall. Ex. O at 487–88. It had been stolen earlier that evening in Hyannis. Ex. N at 282–84.

### Identification of the Assailants

Though none of the witnesses identified the petitioner as one of the assailants, he was identified as someone they had seen at the hall during the weeks leading up to the assault, as well as on the evening of the assault. Specifically, Karen Trott identified Kurt from a photograph as a man she saw at the hall on four or five occasions, including between 5:00 and 7:00 p.m. on July 12th, the night of the assault. Ex. N at 169–172. Karen usually saw the petitioner alone, either smoking on the front porch or playing downstairs, but testified that she had also seen him at the hall with a dark-haired woman. Ex. N at 172. She remembered the petitioner because he was young and usually rode a bike to the hall. Ex. N at 173. Karen could not identify the petitioner in court as the man she had previously identified in photographs or as the man who had been at the bingo hall. Ex. N at 173.

Richard Trott also identified the petitioner as a man previously seen at the hall, including early on the night on July 12th. Ex. N at 217–20, 223, 231. Kurt stood out because he was younger than the usual attendees. Ex. N at 227. On one occa-

sion, Kurt was with a young woman. Ex. N at 226. Richard testified that, on several occasions in the weeks preceding the incident, the petitioner expressed interest in the size of the jackpot and when jackpot tickets would go on sale. Ex. N at 227–30, 264–65. Kurt occasionally sat in an unusual spot, near the office where the bingo money was kept, and spoke to Susan. Ex. N at 137. On the night of the incident, the petitioner again asked Richard about the jackpot and bought tickets to that night's drawing. Ex. N at 231. Nobody won the jackpot drawing that night, which occurred between 5:45 and 6:00 p.m. Ex. N at 233. Richard did not see the petitioner at the bingo hall after the jackpot drawing. *Id.* In August 2003, Richard identified Kurt from a photograph as the man he had seen at the bingo hall several times. Ex. N at 217–20. At trial, Richard identified Kurt as the man previously seen at the bingo hall, and testified that he had gained roughly 30 pounds, had a "fuller" face, and darker hair since the time of the incident. Ex. N at 233–34. These changes in appearance were confirmed by Detective Paul Evanson as well. Ex. N at 246.

Susan Trott also recalled speaking with a man about the jackpot game. Ex. M at 136. About two weeks before the incident, she spoke to a man sitting just outside her office who was white, and "youngish," maybe 20–30 years old. Ex. M at 137.

### The Petitioner's Activities

Jennifer Magoon ("Magoon") lived in West Hyannisport in July 2003 with her two children. Ex. O at 363–64. The stolen jeep was found abandoned about one mile from her house. Ex. O at 488. While Magoon could not identify the petitioner at trial, Ex. O at 357–58, she was vary familiar with the petitioner's brother, Kevin, Kevin's girlfriend Novalee Martin, and the petitioner's co-defendant, Chris Glover, all

of whom had been staying with her at the time of the incident. Ex. O at 364–70.

Specifically, the evidence was that on July 4, 2003, Martin asked Magoon to care for Martin's seven year old son and three year old daughter. Ex. O at 364. The children ended up staying with Magoon for nine days. Ex. O at 366–67. On July 9, 2003, Martin and her boyfriend Kevin Brown also moved in with Magoon for a few days. Ex. O at 367–68. Kevin's friend Chris Glover came to visit several times, and spent the nights of July 10 and 11, 2003 at Magoon's house as well. Ex. O at 369–70, 440.

On July 12, 2003, Magoon spent most of the day chasing after Martin's children while Martin, Kevin Brown, Glover, and some other company, kept to themselves, talking on the front porch. Ex. O at 371. When Magoon approached the group, conversation would die off. *Id.* At some point that day, Magoon answered her phone and the caller, identifying himself as "Kurt Brown. I'm Kevin's brother Kurt," asked to speak with Kevin. Ex. O at 378–79. While Kevin spoke on the phone, Magoon heard him say "If it doesn't go down like this, it doesn't go down at all," and he pounded his fist on the table. Ex. O at 379–80.

Sometime between 4:00 and 5:00 in the afternoon, Martin left the house for approximately 45 minutes, returning with one dark blue and one bright orange ski mask. Ex. O at 373–74. At the time, Kevin remarked that he could not use the bright orange mask. Ex. O at 377. In addition, that day, Magoon asked Martin and Kevin for some money to reimburse her for groceries. Ex. O at 385–86. Magoon testified that Kevin told her that "someone owed him money, approximately $3,000; and that one way or another, he was going to get his money. So, they would help [her] with food." Ex. O at 386.

At approximately 8:45 p.m., Magoon saw a light blue or light gray Jeep pull into her driveway. The driver stood five feet, five or six inches tall, had short light brown hair, and identified himself as "Kurt." Ex. O at 388–90. He weighed between 150 and 170 pounds, and wore a dark blue warm-up suit with a hood, while carrying another dark gray warm-up suit over his arm. Ex. O at 387–90. "Kurt" spoke with Kevin for a few minutes before Kevin put on the gray, hooded warm-up suit and both men, joined now by Glover wearing a black inside-out sweatshirt and black pants, left driving Glover's black Chevy Tahoe. Ex. O at 387–91. Despite the heavy clothing worn by all three men, the weather was hot and humid. Ex. O at 386–87.

The three men returned to Magoon's house around 11:00 p.m. with the man who had previously identified himself as Kurt leaving immediately. Ex. O at 392. Magoon saw Kevin vomit on the side of the driveway before he and Glover, who were joined by Martin, went inside to a bedroom and shut the door behind them. *Id.* Kevin, looking upset, was wearing a white tee shirt and the gray warm up pants, and was sweating, flushed, and red in the face. Ex. O at 392–93. Soon thereafter, after a brief verbal altercation with Magoon, the three house guests packed their belongings, gathered Martin's children, and left. Ex. O at 394–96.

Several days later, the father of Martin's daughter accompanied Magoon to the police station to report an alleged incident that had occurred between Martin's children. Ex. O at 399–403. While at the police station, Magoon inquired about any crimes that may have happened on the night of July 12th. Ex. O at 404–06. Magoon gave the police a written statement about what she had observed at her home that night. Ex. O at 406.

In September 2003, the police showed Magoon some photographs, and she identified Christopher Glover as the "Chris" who had stayed at her house. Ex. O at 409–10. She confirmed this identification in court. Ex. O at 411–12. Detectives never showed Magoon a picture of the petitioner, and she did not identify him in court. *See* Ex. O at 502.

On August 17, 2004, Richard and Thomas Trott met with an Assistant District Attorney to prepare for trial. Ex. O at 522, 529. While there, Thomas saw a number of photographs on the desk, and, unsolicited, identified Kevin Brown as the man who assaulted him. Ex. O at 524–26, 530–32. Kevin's eyes were immediately recognizable to Thomas as being the eyes of the masked man who had the shotgun on him and beat him. Ex. O at 524–25.

As of July 2003, Christopher Glover was about 6′ tall and weighed between 160 and 180 pounds, the petitioner was approximately 5′8″ to 5′9″ tall and weighed between 160 and 180 pounds, and Kevin Brown was about 5′7″ tall and also weighed between 160 and 180 pounds. Ex. O at 484.

### The Facts Referenced By The Appeals Court

As noted above, the Appeals Court, in affirming the petitioner's conviction, gave only transcript citations. The facts cited to by the Appeals Court were as follows:

Susan Trott testified that a week or two before July 12th, a white, youngish man, about 20, 30 years old, sat outside her office, which was unusual. (Tr. 2/137). Karen Trott described the clothing and masks the two men were wearing as well as their height and where they ran after leaving the hall. (Tr. 3/162–164, 186). The Appeals Court also cited her testimony about her photo identification of Kurt as the man she had seen at the bingo hall on various occasions before the assault.

(Tr. 3/171). The Appeals Court cited Richard Trott's testimony about Karen screaming and his running to help his brother (Tr. 3/199), as well as his description of the height of the assailants and their clothing. (Tr. 3/215). Similarly, the Court referenced Richard's identification of a photograph of Kurt as being the man who had come to the hall on several previous occasions and expressed interest in the jackpot game. (Tr. 3/219–20, 227). The Court also cited Richard's testimony that, at the time of the robbery, Kurt's hair was lighter and he weighed approximately 30 pounds less. (Tr. 3/234). The Appeals Court also cited to the testimony of Detective John York of the Barnstable Police Department who testified about the location of the abandoned Jeep. (Tr. 3/324–25). In addition, it cited to the testimony of Barnstable Police Officer Paul Everson who testified that Richard Trott had identified Kurt's photograph as the man he had seen at the hall earlier in the evening before the assault (Tr. 3/345) and that the Jeep was recovered about a half mile from the Knights of Columbus hall, and approximately one mile from Ms. Magoon's house. (Tr. 4/487–88). The Appeals Court further cited Jennifer Magoon's testimony about the phone call she had received from an individual identifying himself as Kurt Brown, Kevin's brother (Tr. 4/379), and that Glover, Kevin and Kurt returned to her home around 11:00 p.m. the evening of the assault, at which time Kevin vomited. (Tr. 4/392).

Additional facts will be provided below where appropriate.

### III. ANALYSIS

#### A. Standard of Review

The parties disagree as to the appropriate standard of review. The petitioner contends that he is entitled to *de novo*

review, while the respondent contends that the deferential standard set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), should apply. As detailed herein, this court finds that the AEDPA deferential standard should apply, but the same result would be reached in either case.

■■■ Under 28 U.S.C. § 2254(d), a federal habeas court may not grant a writ of habeas corpus unless the underlying state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). However, "AEDPA's strict standard of review only applies to a 'claim that was adjudicated on the merits in state court proceedings.'" *Fortini v. Murphy,* 257 F.3d 39, 47 (1st Cir.2001) (quoting 28 U.S.C. § 2254(d)). Where "the federal claim was never addressed by the state courts" there is no deference to the state court's decision, since "we can hardly defer to the state court on an issue that the state court did not address." *Id.*

■■ If the state court's adjudication refers only to state law, deference under § 2254(d)(1) may nevertheless be applicable "so long as the state standard is at least as protective of the defendant's rights as its federal counterpart." *Leftwich v. Maloney,* 532 F.3d 20, 23–24 (1st Cir.2008). Thus, if the standard applied by the state court is more favorable or equal to the federal standard, deference is warranted. Otherwise, *de novo* review is required. *Id.* at 24.

■ In the instant case, the Appeals Court did not cite any cases, state or federal, in explaining the basis for its decision. However, it did identify the standard it was applying in reviewing the record, namely whether "the evidence was sufficient, when viewed in the light most favorable to the Commonwealth, for a rational trier of fact to find that the defendant was guilty beyond a reasonable doubt." Ex. F. This is the same standard as the federal constitutional standard of review for sufficiency of evidence challenges. *See Jackson v. Virginia,* 99 S.Ct. at 2789 (the "question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). *See also Commonwealth v. Latimore,* 378 Mass. 671, 677–78, 393 N.E.2d 370, 374–75 (1979) (Massachusetts standard for assessing sufficiency of evidence same as that defined by *Jackson v. Virginia*). Similarly, although the Appeals Court's description of the factual basis for its decision is terse in the extreme, the record citations indicate that there was a full review of the transcript and an assessment of the relevant facts. Under such circumstances, the deferential standard under the AEDPA should apply. *See Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (even if state court is unaware of and does not cite federal cases, state decision is not "contrary to" federal law "so long as neither the reasoning nor the result of the state-court decision contradicts" Supreme Court cases).

Nevertheless, this court recognizes that the Appeals Court did not expressly decide the federal constitutional claim, and that the Court made no direct reference either to federal or state law. The First Circuit

has held that "[i]f the state court has not decided the federal constitutional claim (even by reference to state court decisions dealing with federal constitutional issues), then we cannot say that the constitutional claim was 'adjudicated on the merits' within the meaning of § 2254 and therefore entitled to the deferential review prescribed in subsection (d)." *DiBenedetto v. Hall*, 272 F.3d 1, 6 (1st Cir.2001). However, even assuming, arguendo, that a de novo review is warranted, this court recommends that the habeas petition be denied.

### B. *Sufficiency of the Evidence*

■ The petitioner was convicted as a joint venturer of armed assault with intent to rob, in violation of Mass. Gen. Laws ch. 265, § 18(b). "The elements of armed assault with intent to rob are that the defendant, armed with a dangerous weapon, assaults a person with a specific or actual intent to rob the person assaulted." *Commonwealth v. Rivera*, 445 Mass. 119, 130 n. 15, 833 N.E.2d 1113, 1122 n. 15 (2005). For the petitioner to be guilty as a joint participant in a felony, the Commonwealth had to prove beyond a reasonable doubt that Kurt was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth v. Ortiz*, 424 Mass. 853, 856, 679 N.E.2d 1007, 1009 (1997) (internal quotation and citation omitted). In the instant case, there was more than sufficient evidence that the petitioner's brother, Kevin, was the assailant who possessed the gun and assaulted Thomas Trott—in addition to circumstantial evidence there was the direct identification of Kevin's photograph by the victim. Kurt does not challenge the sufficiency of the evidence against Kevin. Rather, the issue raised here is whether, absent any direct identification of Kurt as either the second assailant or driver of the Jeep, there was sufficient evidence for a jury to find beyond a reasonable doubt that Kurt was present at the hall at the time of the assault. Mere association with the known assailant is insufficient to establish involvement in the felony beyond a reasonable doubt. *See Commonwealth v. Morris*, 422 Mass. 254, 259, 662 N.E.2d 683, 687 (1996). In the instant case, however, there was significantly more circumstantial evidence than mere association to support the guilty verdict beyond a reasonable doubt.

Based on the evidence presented at trial, the jury could find that, like the assailants, Kurt had knowledge of the weekly bingo and jackpot games, he knew that the money was kept in the office and the location of the office, and that the jackpot on the night of July 12, 2003 was at least $3,000 (the amount Kevin said he expected to be getting). Kurt was seen at the bingo hall on the evening of July 12, 2003 up until the time of the jackpot drawing, so he would have known that the jackpot had not been won. He was not seen after the drawing, from which the jury could infer that he left prior to the assault, and could have returned with the others.

Magoon's testimony was sufficient for a jury to find that the petitioner accompanied Kevin and Chris on the evening of July 12th. First she received a phone call from a man who identified himself as "Kevin's brother, Kurt." The petitioner does not deny that he is, in fact, Kevin's brother. Similarly, the man who arrived at her house and met with, and later left with, Kevin and Chris Glover, identified himself as "Kurt." Logic dictates that this is the same Kurt who had called earlier in the day. When Kurt, Kevin and Chris left the house, they were wearing heavy, dark clothing which fit the description of the clothing worn by the assailants. The man

who had earlier identified himself as Kurt returned to Magoon's house with Kevin and Chris at approximately 11:00 p.m., after the incident. Thus, it was appropriate for the jury to conclude that the man who had identified himself as Kevin's brother, Kurt, spent the evening with Kevin and Chris. Since the petitioner is Kevin's brother, Kurt, the jury could find that he was the individual who spent the evening with Kevin and Chris.

Moreover, Kurt's physical appearance matched that of the second assailant. He was a white male with light hair of the approximate height and weight described by the witnesses. He was also a few inches taller than Kevin. This is consistent with the witnesses who all identified the unarmed assailant as being taller than the armed assailant (Kevin). The fact that the petitioner could not be identified in court by all the witnesses who had seen him before the assault was explained by the testimony of Detective Everson and Thomas Trott that he had gained about 30 pounds and his hair was darker than at the time of the assault. The absence of an in-court identification does not preclude a finding that the defendant was the individual identified by witnesses. *See Commonwealth v. Davila*, 17 Mass.App.Ct. 511, 512, 459 N.E.2d 1248, 1249 (1984) ("Proof of the identity of the person who committed the offense may be established in a number of ways and it is not necessary that any one witness should distinctly swear that the defendant was the man, if the result of all the testimony, on comparison of all its details and particulars, should identify him as the offender.") (internal punctuation and citation omitted). These facts are sufficient to find that the petitioner was guilty beyond a reasonable doubt. *See generally Commonwealth v. Evans*, 438 Mass. 142, 147–48, 778 N.E.2d 885, 892 (2002). In sum, while the case against Kurt may have been circumstantial, circumstantial evidence "is entitled to the same weight as direct evidence." *Joseph v. Fair*, 763 F.2d 9, 10 (1st Cir.1985). Even under a de novo review standard, the evidence was sufficient for a rational jury to find the petitioner guilty beyond a reasonable doubt.

## IV. CONCLUSION

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the petition for a writ of habeas corpus (Docket No. 1) be DENIED.[4]

May 1, 2009

---

4. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604–05 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn*, 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v.*

*Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).